**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In Re: | § § § | |
| TRUDY'S TEXAS STAR, INC., | § § | Lead Case No. 20-10108-hcm |
| NOFALIA, INC., | § § § | Second Case No. 20-10212-hcm |
| Jointly Administered Debtors. | § § § § § | Chapter 11 (Jointly Administered Under 20-10108) |
| TRUDY'S TEXAS STAR, INC., | § § § | |
| Plaintiff, | § § | Adv. Pro. No. 20-01019-hcm |
| v. | § § | |
| JIFFY CAPITAL, LLC, | § § § | |
| Defendant. | § § | |

**DEFENDANT JIFFY CAPITAL, LLC'S**
**MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT THEREOF**

Defendant, Jiffy Capital, LLC ("Jiffy Capital"), by and through its undersigned counsel, files this Motion for Summary Judgment and Brief in Support Thereof ("Motion"), pursuant to Fed. R. Civ. P. 56, made applicable to these proceedings by Fed. R. Bankr. P. 7056, and respectfully shows as follows:

**INTRODUCTION**

1.    Without the funding provided by Jiffy Capital, the Debtor would have either closed its doors or filed for bankruptcy in October of 2019.  Despite the fact that Jiffy Capital

1

provided the Debtor with the funding it so desperately needed to continue its operations, the Debtor is now seemly on a mission to punish Jiffy Capital.

2.      What is even more perplexing about the Debtor's apparent dislike for Jiffy Capital is the fact that the Debtor was not harmed as a result of entering into the transactions with Jiffy Capital.  On the contrary, as a result of entering into the transactions with Jiffy Capital, the Debtor was able to continue its operations and received a windfall of $188,638.03.

3.      In any event, it will become clear to this Honorable Court very quickly that the claims that have been brought in this case are unsupported by applicable law, that the Debtor has no evidence to prove the claims, and that Jiffy Capital is entitled to judgment in its favor as a matter of law on all three causes of action.

## THE EVIDENCE

4.      This Motion relies upon the pleadings in this matter and the following evidence: (1) the Declaration of Rick Teller attached hereto as Exhibit 1, along with its exhibits, (ii) a compilation of various agreements from the merchant cash advance industry attached hereto as Exhibit 2, and (iii) the Debtor's Initial Disclosures attached hereto as Exhibit 3.

## UNDISPUTED FACTS

5.      Jiffy Capital is in the business of providing funding solutions for businesses.  The primary funding product offered by Jiffy Capital is a merchant cash advance.  In a merchant cash advance transaction, Jiffy Capital provides funding to a business by making an up-front lump sum payment to the business to purchase an interest in its future receipts, as that term is defined in the agreement executed by Jiffy Capital and the business.  Exhibit 1, ¶3.

6.      Merchant cash advances have existed since 1998.  The merchant cash advance industry has evolved gradually since then. In the beginning, only businesses that accepted credit

and debit card payments were eligible for a merchant advance because the transaction was set up

so that the credit card processor would split the credit card sales, resulting in the merchant cash

advance company receiving the receipts it purchased directly from the credit card processor.

Over time however, the product has changed allowing any business that receives payments,

regardless of the method, to be eligible for a merchant cash advance.  As of 2019, there were

more than one thousand merchant cash advance companies throughout the United States that

generated between $5 billion and $10 billion in funding to businesses each year.  Exhibit 1, ¶4.

7.      A merchant cash advance is a high-risk transaction for the merchant cash advance

company.  If the business does not receive payments, then the merchant cash advance company

also cannot get paid.  This risk, along with other risk factors, determines the fees associated with

obtaining a merchant cash advance and the purchased amount of receipts.  Exhibit 1, ¶5.

8.      Rick Teller, the Director of Underwriting for Jiffy Capital has worked in the

merchant cash advance industry since 2015 in various capacities.  He started Jiffy Capital with

his partners in 2017.  Exhibit 1, ¶6.

9.      Jiffy Capital provides merchant cash advance funding to approximately 10

businesses each week.  Since Jiffy Capital's inception, it has provided approximately $10 million

in merchant cash advances to approximately 500 businesses.  Exhibit 1, ¶7.

10.     All merchant cash advance agreements containthe same general terms, including

those related to obtaining the receipts purchased.  That is, an agreed upon amount of receipts that

is specified in the agreement is to be withdrawn from a bank account designated by the business

every weekday and the business has a right to request a reconciliation of the daily amounts

withdrawn to ensure that such amounts equal the percentage of daily receipts specified in the

agreement.  Exhibit 1, ¶8.

11.     Due to the reconciliation provisions in merchant cash advance agreements, in addition to the daily withdrawals, it is common for a merchant cash advance company to make multiple credits or debits from the account designated by the Debtor on the same day with the business's prior consent.  Exhibit 1, ¶9

### *The October Agreement*

12.     In or around early October of 2019, Trudy's Texas Star ("Debtor") applied for merchant cash advance funding from Jiffy Capital. Mr. Teller was advised that the Debtor was seeking funding because a state taxing authority put a levy on the Debtor's bank account and, as a result, it was unable to make payroll and pay suppliers.  Mr. Teller was further advised that the Debtor would go out of business if the funding was not provided.  Exhibit 1, ¶10.

13.     After due diligence was completed, on or about October 10, 2020, the Debtor and Jiffy Capital entered into a Merchant Agreement (the "October Agreement").  Jiffy Capital agreed to provide the funding to the Debtor because it wanted to help the Debtor stay in business and it was clear from the financials provided by the Debtor that if obtained the funding it would be able to stay in business and generate sufficient Receipts to fulfill its obligations.  Exhibit 1, ¶11.

14.     Under the October Agreement, Jiffy Capital purchased "all of [Debtor's] future accounts, contract rights and other obligations arising from or relating to the payment of monies from [Debtor's] customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), for the payment of [Debtor's] sale of goods or services until [$599,600] ("the Purchased Amount") has been delivered by [Debtor] to [Jiffy

Capital]" in exchange for Jiffy Capital making an up-front lump sum payment of $400,000, less specified fees and costs, to the Debtor. Exhibit 1, ¶12.

15.     Jiffy Capital was to obtain the Receipts it purchased from the Debtor under the October Agreement by withdrawing $3,747.50 each weekday via automated clearing house ("ACH") from a deposit account designated by the Debtor and approved by Jiffy Capital into which the Debtor was to deposit the Receipts until Jiffy Capital received all of the Receipts it purchased under the October Agreement. The Debtor designated its bank account ending in 9453 at Wells Fargo Bank.  Exhibit 1, ¶13.

16.     To the extent that the $3,747.50 was more or less than 15% of the daily Receipts deposited into the designed bank account on any given day, the October Agreement provided for a reconciliation of the amount of Receipts obtained by Jiffy Capital each month so long as the Debtor provided its monthly bank statement to Jiffy Capital.  Exhibit 1, ¶14.

17.     Although the Receipts were deposited into the Debtor's bank account, they were merely being held by the Debtor for Jiffy Capital's benefit.  Pursuant to the terms of the October Agreement, the Debtor was required to give Jiffy Capital information necessary to access the designated bank account so that Jiffy Capital could keep tabs on its property.    Exhibit 1, ¶15.

18.     On October 11, 2019, Jiffy Capital paid $376,000 to the Debtor via wire transfer to its bank account ending in 9094 at Wells Fargo Bank to purchase the Receipts.    Exhibit 1, ¶16.

19.     On October 11, 2018, Jiffy Capital filed a UCC-1 Financing Statement with the Texas Secretary of State to perfect its interest in the Receipts.  Exhibit 1, ¶17

20.      Between October 15, 2019 and January 22, 2020, a total of $244,037.50 in Receipts were obtained by Jiffy Capital as a result of withdrawals in the amount of $3,747.50 each weekday from the designated bank account.  Exhibit 1, ¶18.

### The November Agreement

21.      In or around early November of 2019, prior to Jiffy Capital receiving all Receipts it purchased under the October Agreement, the Debtor approached Jiffy Capital seeking additional funding.   Mr. Teller was advised the Debtor had come to an agreement with the state taxing authority that levied its bank account and that it needed the funding to ensure it did not fall behind on that agreement.  Exhibit 1, ¶19.

22.      After due diligence was completed, on or about November 20, 2019, the Debtor and Jiffy Capital entered into another Merchant Agreement (the "November Agreement"). Exhibit 1, ¶20.  The October Agreement and November Agreement are collectively referred to herein as the "Merchant Agreements".

23.      Under the November Agreement, Jiffy Capital purchased "all of [Debtor's] future accounts, contract rights and other obligations arising from or relating to the payment of monies from [Debtor's] customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the merchant's business), for the payment of [Debtor's] sale of goods or services until [$145,900] ("the Purchased Amount") has been delivered by [Debtor] to [Jiffy Capital]" in exchange for Jiffy Capital making an up-front lump sum payment of $100,000, less specified fees and costs to the Debtor.  Exhibit 1, ¶21.

24.      Jiffy Capital was to obtain the Receipts it purchased from the Debtor under the November Agreement by withdrawing $999.31 each weekday via ACH from a deposit account

designated by the Debtor and approved by Jiffy Capital into which the Debtor was to deposit the Receipts until Jiffy Capital received all of the Receipts it purchased under the November Agreement. The Debtor designated a bank account ending in 9453 at Wells Fargo Bank. Exhibit 1, ¶22.

25.     To the extent that the $999.31 was more or less than 15% of the daily Receipts deposited into the designed bank account on any given day, the October Agreement provided for a reconciliation of the amount of Receipts obtained by Jiffy Capital each month so long as the Debtor provided its monthly bank statement to Jiffy Capital.   Exhibit 1, ¶23.

26.     Although the Receipts purchased under the November Agreement were deposited into the Debtor's bank account, they were merely being held by the Debtor for Jiffy Capital's benefit.  Like the October Agreement, under the November Agreement, the Debtor was required to give Jiffy Capital the information necessary to access the designated bank account so that Jiffy Capital could keep tabs on its property.   Exhibit 1, ¶24.

27.     On November 22, 2019, Jiffy Capital paid $94,000 via ACH to the Debtor's bank account ending in 9453 at Wells Fargo Bank to purchase the Receipts.  Exhibit 1, ¶25.

28.     Between November 25, 2019 and January 22, 2020, a total of $37,324.47 in Receipts were obtained by Jiffy Capital as a result of withdrawals in the amount of $999.31 each weekday from the designated bank account.  Exhibit 1, ¶26

29.     Under the Merchant Agreements, Jiffy Capital paid a total of $470,000 to the Debtor and only received a total of $281,361.97.  Exhibit 1, ¶27.

30.     The Debtor ultimately defaulted under the terms of the Merchant Agreements in or around December of 2019.  Exhibit 1, ¶28.

## ARGUMENT

### I.    Legal Standard – Summary Judgment

31.    A party is entitled to summary judgment if the moving party demonstrates that there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Also see*,  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).  A genuine dispute of material fact exists if a reasonable fact-finder could resolve the case in the non-movant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

32.    The moving party bears the burden of demonstrating no genuine issue of material fact exists.  *Celotex Corp.*, 477 U.S. at 322–23, 106 S. Ct. at 2552.  A defendant seeking summary judgment on a plaintiff's cause of action may demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim, or (2) showing there is no evidence to support an essential element of plaintiff's claim.  *Id.*

33.    Once the moving party has made an initial showing that there is no evidence to support the non-moving party's case, the party opposing the motion must come forward with competent evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his claim.  *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).[1]

---

[1] The Debtor has not served any documents on Jiffy Capital in this case.  Pursuant to Fed. R. Civ. P. 26(a)(1)(A)(ii), the Debtor was required to provide such documents "without awaiting a

## II.   Jiffy Capital is Entitled to Judgment in its Favor on the Third Cause of Action

34.    In the Third Cause of Action, the Debtor seeks to avoid, under 11 U.S.C. §547(b), and recover, under 11 U.S.C. §550, purported transfers of property of the Debtor to Jiffy Capital during the 90 days prior to the Petition Date.  The Debtor has the burden of proving each element of the cause of action set forth in 11 U.S.C. §547(b).  11 U.S.C. §547(g).  The Debtor is unable to meet its burden of proving each element under 11 U.S.C. §547(b) and, even if it was able to do so, the claim is nevertheless barred by the ordinary course defense set forth in 11 U.S.C. §547(b).

### A.    There Was No Transfer of an Interest of the Debtor in Property to Jiffy Capital

35.    The first element of the claim under 11 U.S.C. §547(b) is that the transfer was "a transfer of an interest of the Debtor in property."  The Supreme Court has recognized that for the purposes of 11 U.S.C. §547(b), "property of the debtor" is property that would have been property of the estate had it not been transferred prior to the commencement of the case.  *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 58, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990).  Section 541 of the Bankruptcy Code sets forth what is considered property of the estate.  It provides, in

---

discovery request."  The Debtor only provided the following list of documents in its Initial Disclosures:

- Contracts between Jiffy Capital and the Debtor and related documents
- Transaction Histories for Transactions
- All documents provided by Debtor to Jiffy Capital, LLC
- Debtor's records showing funds taken by Jiffy Capital, LLC.
- Notifications given by Jiffy Capital, LLC to parties owing money to the Debtor.

*See* Exhibit 3. The Debtor has produced no documents during discovery or disclosed any further documents.  As a result, the Debtor is prohibited from using any documents other than those listed in its Initial Disclosures when responding to this Motion.  *See* Fed. R. Civ. P. 37(c).

relevant part, that property of the estate consists of "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §541(a)(1).

36.     The Debtor simply cannot establish that what Jiffy Capital obtained was property of the Debtor.  What Jiffy Capital obtained were the Receipts that the Debtor sold to it prior to the Petition Date, not the Debtor's property. The Merchant Agreements specifically provide that the Debtor sold, assigned and transferred the Receipts to Jiffy Capital.  *See* Merchant Agreements, Pg. 2.  Since the Receipts were sold to Jiffy Capital prior to the Petition Date they would not have been property of the estate if they had not been obtained by Jiffy Capital because the Debtor no longer had a legal or equitable interest in them.

37.     The fact that the withdrawals were from a bank account does not change this analysis.[2]  "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate'…nor is such an equitable interest 'property of the debtor' for the purposes of 11 U.S.C. §547(b)."  *Begier v. Internal Revenue Serv.*, 496 U.S. 53, 59, 110 S. Ct. 2258, 110 L.Ed.2d 46 (1990);  *see also, Jenkins v. Chase Home Mortg. Corp. (In re Maple Mortg., Inc.)*, 81 F. 3d 592, 596 (5th Cir. 1996).  In determining whether a party intended to create a trust the test is whether a party intended for a person receiving the money to have a beneficial, as well as, a legal interest in it."  *In re Dreier LLP*, 452 B.R. 391, 421 (Bankr. S.D.N.Y. 2011). "It is black letter law that the commingling of funds in a trust account does not destroy or alter the nature of the deposited funds." *Id*. at 419.

38.     Pursuant to the express terms of the Merchant Agreements, the Debtor was to designate a bank account into which the Receipts it purchased would be deposited.  The Debtor was to then hold the Receipts for Jiffy Capital's benefit in that account and Jiffy Capital would

---

[2] It is worth noting that because the withdrawals were made from a deposit account Jiffy Capital took the Receipts free of any security interest. *See* UCC §9-332.

withdraw the amount of Receipts it was entitled to on a daily basis from that account. *See* Merchant Agreements, Pg. 2.

39.     The fact that the Debtor was merely holding the Receipts for the benefit of Jiffy Capital and did not have an equitable interest in them is apparent from the express terms of the Merchant Agreements. The Debtor was required to provide Jiffy Capital with full unfettered access to not only withdraw funds from the account (and credit funds to the account, if appropriate), but to view the activity in the deposit account into which the Receipts were to be deposited so that it could keep tabs on its property and complete any requested reconciliations. *See* Merchant Agreement, Pg. 2 ("[Debtor] will provide [Jiffy Capital] with all required access codes…").

40.     Since the Receipts that were obtained by Jiffy Capital would not have been property of the estate had it not been transferred prior to the commencement of the case because they were to be held in trust for the benefit of Jiffy Capital, there was no transfer of an interest of the Debtor in property and the Debtor cannot, as a matter of law, establish an essential element of the claim under 11 U.S.C. §547(b).  Therefore, summary judgment should be granted in favor of Jiffy Capital on the Third Cause of Action.

**B.     The Debtor Cannot Establish Other Elements of the Claim Under 11 U.S.C. §547(b)**

41.     Another element of the cause of action under 11 U.S.C. §547 is that the transfer enabled the creditor to receive more than it would have if the case were a case under chapter 7 of this title, the transfer had not been made, and such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.  *See* 11 U.S.C. §547(b).

42.     The Debtor has no evidence to establish this element of the claim under 11 U.S.C. §547(b).  This is clear from the list of documents included in its Initial Disclosures.  As the

Debtor cannot establish this element, summary judgment should be granted in favor of Jiffy Capital.

### C.     Even if the Debtor Could Meet its Burden of Proving all Elements of the Claim under 11 U.S.C. §547(b), the Ordinary Course Defense Bars the Claim

43.     Section 547(c) of the Bankruptcy Code sets forth various defenses to a claim under 11 U.S.C. §547(b).  Section 547(c)(2) of the Bankruptcy Code, commonly referred to as the "ordinary course defense," bar the avoidance of a transfer under 11 U.S.C. §547(b) if the transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and the transfer was made in the ordinary course of business or financial affairs of the debtor and transferee *or* made according to ordinary business terms.

44.     In this case, if the Court were to find that the Debtor proved all elements of the claim under 11 U.S.C. §547(b), the ordinary course defense set forth in 11 U.S.C. §547(c) would nevertheless prohibit the Debtor from avoiding the transfers.

### i.     *The Debt Was Incurred in the Ordinary Course of Business or Financial Affairs of the Debtor and Jiffy Capital*

45.     The first element of the ordinary course defense is that the underlying debt for which the transfer was made was "incurred by the debtor in the ordinary course of business or financial affairs of the debtor and transferee."  11 U.S.C. §547(c).  "To meet the "debt incurred" element of this affirmative defense, all that is required is that a debt be incurred in a "subjectively" ordinary course of business." *In re KLN Steel Prod. Co., LLC*, 506 B.R. 461, 470–71 (Bankr. W.D. Tex. 2014) (Davis, J.).  For this element, "courts generally are interested in whether the debt was incurred in a typical, arms-length commercial transaction that occurred in the marketplace." *In re C.W. Min. Co.*, 500 B.R. 635, 642 (B.A.P. 10th Cir. 2013), aff'd, 798

F.3d 983 (10th Cir. 2015) citing 5 *Collier on Bankruptcy* ¶ 547.04[2][a][i].  For a debt to be incurred in the ordinary course, "the transaction need not have been common; it need only be ordinary." *Id.*

46.     There is no question that the debt was incurred in the ordinary course of business or financial affairs of the Debtor and Jiffy Capital.  The transaction was indeed a typical, arms-length commercial transaction that occurred in the marketplace.  The Debtor sought funding for its business in the open market and Jiffy Capital, who is in the business of providing funding to businesses, provided the funding that was requested by the Debtor.  Because the transaction was an arms-length commercial transaction, there is no question the debt was incurred in the ordinary course.

ii.     *The Transfers Were Made in the Ordinary Course of Business or Financial Affairs of the Debtor and Jiffy Capital and According to Ordinary Business Terms*

47.     The second part of the ordinary course defense is an "either-or.". To satisfy this element, the transfers must be "made in the ordinary course of business or financial affairs of the debtor and the transferee" or "made according to ordinary business terms." 11 U.S.C. §547(c)(2)(A) and (B). Here, the evidence shows that the Transfers were made both in the ordinary course of business or financial affairs of the Debtor and Jiffy Capital and made according to ordinary business terms.

48.     To determine whether the transfers were "made in the ordinary course of business or financial affairs of the debtor and the transferee," courts look at "whether the transactions between the debtor and the creditor before and during the ninety-day period are consistent." *In re Sterry Indus., Inc.,* 553 B.R. 96, 100–01 (Bankr. W.D. Tex. 2016) (Davis, J.).

49.     "While...the strongest factor supporting a determination that business between the debtor and a creditor is ordinary is the history of dealing between the parties...the ordinary course

13

of business may be established by the terms of the parties' agreement." *In re Computer World Solution, Inc.*, 427 B.R. 680, 690-691 (N.D. Ill. 2010).  If the transfer is conducted according to the parties' agreement with regard to timing and manner, the transfers are ordinary as between the parties. *Id*.

50.      Ninety days prior to January 22, 2020 (the "Petition Date") was October 24, 2019.  Prior to October 24, 2019, Jiffy Capital withdrew the amount of Receipts agreed upon in the October Agreement every weekday from the designed bank account in accordance with the terms of the October Agreement.  After October 24, 2019, Jiffy Capital continued to do the same. The course of dealing with respect to the October Agreement did not change during the 90 days prior to the Petition Date.

51.      The withdrawals by Jiffy Capital under the November Agreement were done according to the terms of the November Agreement without any deviation.   Jiffy Capital withdrew $999.31 each weekday from the designated bank account as provided for the November Agreement.

52.      Thus, the transfers were made in the ordinary course of business or financial affairs of the Debtor and Jiffy Capital.

53.      "A payment is 'according to ordinary business terms' if the payment practices at issue comport with the standard of the industry."  *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 368 (5th Cir. 2002).  The Fifth Circuit has explained the analysis as follows:

> the relevant inquiry is "objective"; that is to say, we compare the credit arrangements between other similarly situated debtors and creditors in the industry to see whether the payment practices at issue are consistent with what takes place in the industry.  By consistent, we do not necessarily mean identical. In *In re Tolona Pizza Products Corp.,* 3 F.3d 1029, 1032–33 (7th Cir.1993), Judge Posner recognized that *strict* conformity to some industry standard may be inappropriate because credit arrangements will not be identical for every debtor and creditor in an industry. Importantly, the law "should not push businessmen to agree upon a single set of billing practices." *Id.* at 1033. In Judge Posner's view, "

> 'ordinary business terms' refers to the *range* of terms that encompasses the
> practices in which firms similar in some general way to the creditor in question
> engage, and that only dealings so *idiosyncratic* as to fall outside that broad range
> should be deemed extraordinary and therefore outside the scope of subsection C."
> *Id.* (first emphasis in original).

*Id.* "[T]he ultimate question is simply whether a particular arrangement is so out of line with what others [in the industry] do that it fails to be "according to ordinary business terms." *Id*. at 369. To demonstrate the industry standard, "the creditor should provide evidence of credit arrangements of other creditors in a similar market…." *Id.*

54.     All merchant cash advance agreements contain the same general terms, including those related to obtaining the receipts purchased. That is, an agreed upon amount of receipts that is specified in the agreement is to be withdrawn from a bank account designated by the business every weekday and the business has a right to request a reconciliation of the daily amounts withdrawn to ensure that such amounts equal the percentage of daily receipts specified in the agreement.

55.     The fact that the Merchant Agreements contain the same general terms as the agreements used by other merchant cash advance companies, particularly with regard to the method of obtaining the purchased receipts and frequency of withdrawals of the receipts, is evident from the compilation of agreements from the merchant cash advance industry attached hereto as Exhibit 2. Because the terms of the Merchant Agreement are consistent with the general terms used in the merchant cash advance industry, the transfers were made according to ordinary business terms.

## II.     Jiffy Capital is Entitled to Summary Judgment in its Favor on the Second Cause of Action

56.     In the Second Cause of Action the Debtor asserts that Jiffy Capital should not be entitled to a claim because the transactions between Jiffy Capital and the Debtor violate New

York's criminal usury law.  There is no cause of action available under New York law for a purported violation of New York's criminal usury limit.  Criminal usury is strictly an affirmative defense to an action seeking repayment of a loan.  *See, e.g. Metropolitan Enters. NY v. AMC United, Inc.,* 2013 N.Y. Misc.  LEXIS 1202 (Sup. Ct. N.Y. 2013) ("Nor may defendant maintain an action pursuant to Penal Law §190.40, the criminal usury statute.  The statutory exception for interest exceeding 25% per annum is strictly an affirmative defense to an action seeking repayment of a loan.").

57.  There is *zero* precedent in New York that supports the conclusion that the affirmative defense of criminal usury applies to merchant cash advances.  This is because a merchant cash advance is a sale not a loan.[3]  This very issue has been extensively litigated in New York courts and they have unanimously determined that the affirmative defense of criminal usury does not apply to merchant cash advances.  A sampling of cases concluding that the affirmative defense of criminal usury does not apply to merchant cash advances is attached as Exhibit 4.  In fact, the issue is so well settled New York judges have even *sua sponte* sanctioned defendants for even asserting that the defense of criminal usury applies to a merchant cash advance.  *See e.g., Yellowstone Capital, LLC v. Central USA Wireless, LLC,* 2018 N.Y. Slip Op

---

[3] The essential element of usury is the existence of a loan or forbearance of money. *Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc.,* 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017).  Without a loan there can be no usury.  *Id*.  To constitute a loan, the transaction must involve a borrower and a lender.  *Id*. at 281.  Furthermore, the lender must have purposefully loaned money at a usurious interest reserved in some form by the contract, and the borrower must have agreed to the usurious terms.  *Id*.  When a payment or enforcement rests on a contingency, the agreement is valid though it provides for a return in excess of the legal rate of interest. *Id.*

31319 (Sup.Ct. June 25, 2018).[4]  Thus, it is unclear how the Debtor could seriously believe that the defense of criminal usury could possibly be available to it.

58.      The Debtor has the burden of proving all elements of usury by clear and convincing evidence.  *See, e.g.  Womack v. Capital Stack, LLC*, 2019 WL 4142740, *5 (S.D.N.Y. Aug. 30, 2019); *K9 Bytes, Inc. v. Arch Capital Funding, LLC*, 56 Misc. 3d 807, 816 (N.Y. Sup Ct. May 4, 2017).  New York State Courts encourage courts to consider three factors to determine if an agreement is a loan or a sale. *Womack*, 2019 WL 4142740, *7.   All of these factors are geared toward determining whether repayment is absolute or contingent.  *K9 Bytes, Inc.*, 56 Misc. 3d at 817. ("In determining whether a transaction is a loan or not, the Court must examine whether or not defendant is absolutely entitled to repayment under all circumstances. For a true loan it is essential to provide for repayment absolutely and at all event or that the principal in some way be secured as distinguished from being put in hazard.").

59.      The first factor is whether there is a reconciliation provision that allows the merchant to "seek an adjustment of the amounts being withdrawn from its account based on its cash flow (or lack thereof)".  *Id*. The Merchant Agreements contain such a reconciliation provision.  *See* Merchant Agreements, Pg. 2.

60.      The second factor is whether there is uncertainty in the term of the agreement.  *Id*. It is clear from Section 1.2 of the Merchant Agreements their terms are the length of time it takes to obtain all the Receipts purchased.

61.      The third factor is whether the defendant has any recourse should the merchant declare bankruptcy.  *Id*. For this factor the courts examine whether bankruptcy is an event of

---

[4] The *Merchant Funding Services v. Volunteer Pharmacy, Inc.* case and the *Pearl Capital Rivis Ventures v. RDN Construction* cases mentioned in this opinion were overturned by the New York Supreme Court Appellate Division on January 29, 2020.

default under the agreement. *Id*. Bankruptcy is not an event of default under the Merchant Agreements.

62.     As all three factors exist here, under New York law, the transaction is not a loan and the affirmative defense of criminal usury is in applicable.   Summary judgment should be granted in favor of Jiffy Capital on the Second Cause of Action.

## III.     Jiffy Capital is Entitled to Summary Judgment in its Favor on the First Cause of Action

63.     In the First Cause of Action, the Debtor seeks a declaration that "the Merchant Agreements did not create a valid sale of receivables."  As demonstrated in the forgoing section, New York courts have time and time again held that a merchant cash advance is a sale of future receivables.   In *Womack*, the court specifically stated that a merchant cash advance is an "agreement to purchase future receivables for a lump sum discounted purchase price payable in advance by the plaintiff in exchange for a contingent return."

64.     Bankruptcy courts have also examined merchant cash advance transactions and have come to the conclusion that merchant cash advances are indeed sales.  *See, e.g. In re R.J.. Pizza Corp.*, 2014 Bankr. LEXIS 5461 (E.D. N.Y. 2014).

65.     Considering this, there simply is no reason for this court to rehash well settled case law simply because the Debtor wants to get out of meeting is obligations under the Merchant Agreements. The Court should rely on the ample case law establishing that merchant cash advances are sales and grant summary judgment in favor of Jiffy Capital.

## IV.     The Debtor Cannot Establish that Jiffy Capital's Claim is Unsecured

66.     In the First Cause of Action, the Debtor also seeks a declaration that Jiffy Capital's claim is unsecured.  The party challenging a claim under 11 U.S.C. §506(a) has the

burden of proof.    *In re Heritage Highgate, Inc.*, 679 F.3d 132, 139–40 (3d Cir. 2012). In the context of 11 U.S.C. §506, the court does not value the property itself, but the creditor's interest in the property.  *In re Saunders*, 112 B.R. 844, 845 (Bankr. W.D. Tex. 1990); *In re Raylin Dev. Co.,* 110 B.R. 259, 261 (Bankr. W.D. Tex. 1989).  A valuation under 11 U.S.C. §506 must be made in light of the use of the property and from the point of view of what the property would be worth in the hands of the creditor. *Matter of Sandy Ridge Dev. Corp.,* 881 F.2d 1346, 1354 (5th Cir. 1989,  *In re Spacek*, 112 B.R. 162, 163 (Bankr. W.D. Tex. 1990).

67.    The Debtor has no evidence of what the value of Jiffy Capital's interest in the property is.  This is again apparent from simply examining the documents that the Debtor disclosed support its claims in its Initial Disclosures.  Since the Debtor has no evidence relevant to value, summary judgment must be granted in favor of Jiffy Capital.

## CONCLUSION

68.    Summary judgment should be granted in favor of Jiffy Capital on all three counts of the Complaint because, as demonstrated herein, there is no genuine issue of material fact and Jiffy Capital in entitled to judgment as a matter of law.  The Court should also grant Jiffy Capital such other and further relief as this Court deems just and proper considering the facts and circumstances of this case.

Respectfully Submitted,

VARNUM LLP
160 W. Fort Street, 5th Floor
Detroit, Michigan 48226
Phone: (313) 481-7332
Fax: (313) 481-7340

__*/s/ Shanna M. Kaminski*_____
Michigan State Bar ID: P74013
smkaminski@varnumlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on July 22, 2020, a true and correct copy of the foregoing Motion for Summary Judgment and Brief in Support was served via ECF on the following parties:

**Stephen W. Sather**
Barron & Newburger, P.C.
7320 N MoPac Expy
Suite 400
Austin, TX 78731
ssather@bn-lawyers.com

_____ */s/ Shanna M. Kaminski* _____